**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
**Buffalo Division**

---

**KATHLEEN CZAJA,**

|                          |                    |
|--------------------------|--------------------|
| **PLAINTIFF,**           | **Civil Action No.** |
| **V.**                   |                    |
|                          | **20-cv-1721**     |
| **DELTA AIRLINES,**      |                    |
| **DEFENDANT.**           |                    |

---

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS

### FACTS

The Plaintiff, Kathleen Czaja, was employed by the Defendant, Delta Airlines as a full time flight attendant.

As noted in her complaint, during a flight on March 25, 2015, the aircraft Ms. Czaja was in experienced turbulence, causing Ms. Czaja to lose her balance because of the high-heeled shoes Delta's uniform policy required her to wear.

As a result Ms. Czaja suffered an injury which made walking and standing for long periods very difficult.  Walking and standing for periods of time were her primary duties as a flight attendant thus the limitations that resulted from her injury would affect Ms. Czaja's ability to perform the essential functions of her job without an accommodation.

The defendant was duly informed of the injury on the day it happened as Ms. Czaja notified to the Defendant's claims manager, Sedgwick Claims Management Services, Inc. ("Sedgwick"). The next day, March 26, 2015, Ms. Czaja informed Delta managers at the Atlanta airport about her injury and asked about taking a leave of absence to get medical treatment.  Ms.

Czaja was informed that she could <u>take a taxi to a nearby urgent care facility and pay for</u> <u>treatment herself</u>.  She was also told that if she if she missed a flight that would count as a "strike" on her personnel record.

Fearing such discipline Ms. Czaja continued to work for several weeks even though her injury caused her a great deal of pain.

On April 15, 2015, Ms. Czaja began treatment for her injury and did take sick leave in the form of Short-Term Disability leave so as to be able to receive additional treatments.

In July 2015 Ms. Czaja had several communications with Sedgwick about her returning to Delta to her flight attendant position with accommodation of not having to wear high heeled shoes.  Ms. Czaja suggested she be allowed to wear shoes without heels and requested black sneakers, which was denied.  Ms. Czaja then suggested black lace shoes, which were in fact acceptable under the Defendant's uniform policy.  This request too was denied.

At this time Ms. Czaja also asked Sedgwick about the possibility of transferring to a new position at Delta instead of returning as a flight attendant with a no heel lace shoes accommodation.  Sedgwick informed Ms. Czaja that decision was not in Sedgwick's "area" and that switching positions was not an option. Dkt. 1, para 18.  At no point did Sedgwick inform Ms. Czaja that she could contact Delta directly about accommodations or switching jobs.

Ms. Czaja continued to search for acceptable footwear and in March 2016 underwent surgery to treat her injury.  In the intervening year (March 2015- March 2016) Ms. Czaja had applied for a marketing position with the Defendant.  Ms. Czaja had received a Bachelor's degree in business administration from St. Bonaventure University in 2009 and would appear have qualifications for such a position, but she was never called for an interview. Dkt. 1, para 21.

In the summer of 2016 Ms. Czaja was informed by her physician she could return to

work but must be in a sedentary position, do no standing or walk for more thant three hourse and do no lifting over twenty pounds. Dkt. 1, para 21.  As a result of this Ms. Czaja contacted Defendant detailing her accommodation problems and asking if there was a possibility of transferring to another position. Dkt. 1, para 22.  This request was circulated to other managers and eventually to to Irma Contreras, base manager for Delta's Atlanta, Georgia hub.

Despite her specific inquiry regarding alternative positions, the only offer to Ms. Czaja was flight attendant.  Dkt 1, para 23.

Ms. Czaja did attempt to return as flight attendant but did supply a physician's note that indicated Ms. Czaja could only wear flat shoes.  The Defendant denied this request stating that only loafers with a half-inch heel would suffice under its uniform policy.

In April 2017 the Defendant did have Ms. Czaja do an independent medical examination (IME).  The IME physician recommended that Ms. Czaja not wear heels again to avoid the risk of re-injury.  The IME physician also declared this restriction on wearing heels to be permanent.

Another independent medical examination was conducted in December 2017.  The examining physician confirmed the restriction on Ms. Czaja wearing any heels and further stated that Ms. Czaja was unable to perform in-flight and post-flight duties such as pushing 170 to 250 pound carts, assisting disabled passengers, opening 40 to 60 pound doors, or assisting passengers with luggage.

The examining physician also stated that Ms. Czaja could not do the twisting, kneeling, climbing, or squatting required for the flight attendant position, and that Ms. Czaja could not stand for long periods of time, which was also requirements of the position of flight attendant.

This meant that Ms. Czaja was physically unable to return to work as a flight attendant, even with an exception to the uniform policy's shoe requirements.

In January 2018, Delta sent Ms. Czaja a letter stating it had been notified by Sedgwick that she had a disability that prevented her from working as a flight attendant but also providing her with information on how to submit an accommodation request.  With that letter, Delta provided Ms. Czaja with a copy of its Job Accommodation Program Guidelines.  One of the offers in the guideline was that the Defendant would provide alternative position assistance to employees with medical impairments that prevent them from returning to their previous positions.  Under this program employees who are no longer able to perform the essential functions of their position are helped to identify and secure another position with the Defendant for which the employee is qualified and able to perform within the individual's work restrictions.

Ms. Czaja was provided with required form, conferred with Annelyse Sanders at Delta about what she needed to do to move forward with this accommodation request.  Ms. Czaja ws instructed to supply a printout of the Delta uniform guide and she was to have her doctors cross of any shoe types not allowed to wear.  Dkt. 1, para 31.

Ms. Czaja's physician provided a note recommending against Ms. Czaja returning as a flight attendant. Dkt. 1, para 32.  Ms. Sanders never replied to Ms. Czaja after Ms. Czaja sent the doctor's note.  Ms. Czaja made several phone calls to Delta's Employee Service Center and Delta Human Resources, but was unable to reach someone who could help.

On July 19, 2018, Ms. Sanders sent Ms. Czaja a letter informing her that Delta was closing her request for an accommodation.  The following week, Ms. Czaja sent an email to Delta Accommodations requesting confirmation as to whether Delta could help her find a new position.  Ms. Czaja received an automatic reply from Delta Accommodations informing stating, "You will be contacted upon review of this email request, if you are a: candidate for a Delta position seeking an accommodation for assistance with the application process due to a medical

impairment, or; current Delta employee seeking a job accommodation or participating in the Alternative Position Program."

On July 30, 2018, Sue Rice, from Delta Accommodations emailed Ms. Czaja requesting that Ms. Czaja call her. When Ms. Czaja called her later that day, Ms. Rice asked what Ms. Czaja was asking Delta to do, as her last doctor's note made it seem like an accommodation was not an option for her.  Ms. Czaja then asked Ms. Rice what her options were.  She was told by Ms. Rice that she could only get an accommodation that was approved within the uniform guidelines. At no point did Ms. Rice mention anything to Ms. Czaja about Delta helping her identify and secure another position at Delta.

On August 3, 2018, Ms. Czaja emailed Delta Accommodations again. In that email, Ms. Czaja noted her conversation with Ms. Rice about the letter from Ms. Czaja's surgeon that Ms. Czaja had sent to Delta Accommodations and asked Delta Accommodations to advise what the next step in the accommodations process was. Delta Accommodations never replied to this email.

On October 1, 2018, Ms. Czaja emailed William Ittounas, HR manager for In-Flight Services at Delta's New York City area airports, in the hopes he could assist her as no one else at Delta seemed willing to do so.  In her email, Ms. Czaja explained how little Delta had communicated with her over the prior few years, and asked if he could provide her copies of Delta's employee policies/handbook regarding injured employees.  Mr. Ittounas forwarded my email to Ms. Emily Pardo, another HR manager.

On October 2, 2018, Ms. Czaja mailed Ms. Pardo asking about Delta's employee policies/handbook regarding employment changes, and informed Ms. Pardo, "I have not been given this information or talked to about the process and it's been 3.5 years."  Ms. Czaja also

requested Ms. Pardo provide copies of the documents Ms. Czaja signed after her first interview with Delta, which were contained within her employee file.

On October 26, 2018, Ms. Czaja was finally able to speak with Ms. Sanders on the phone about accommodations. During this conversation, Ms. Sanders informed Ms. Czaja that she could not provide her anything from my employee file.  Ms. Sanders did reference Ms. Czaja's February 5, 2018 application for accommodation, their April 4, 2018 phone conversation, Ms. Czaja's doctor's note of April 20, 2018 indicating that Ms. Czaja could not return to work as a flight attendant, and Ms. Czaja's August 3, 2018 email asking Delta Accommodations for the next step in the accommodations process. At no point in this conversation did Ms. Sanders advise Ms. Czaja on how Delta might help her find another position.

## ARGUMENT

Timeliness:

Defendant offers that Ms. Czaja's Americans with Disabilities Act (ADA) claims in time barre due the date of filing of the Ms. Czaja's EEOC.  Dkt. 10, pg. 8.

Plaintiff concurs with Defendant's analysis of time to file a complaint with the EEOC for this instant matter was three hundred days.  Dkt. 10, pg. 8.  Thus the earliest actionable event that could be included in her May 30, 2019 claim would have been August 3, 2018.

Defendant asserts that Plaintiff's communications with Sedgwick seeking an exception to Delta's footwear policy as an accommodation all occurred and were allegedly denied in 2015 and early 2016. Compl. ¶¶ 17-19.  Plaintiff has not, by her own admission, sought a return to Delta as a flight attendant since that time (*see id.* ¶¶ 25-38) and in fact has conceded that she has not been and is not currently a "qualified individual" for that position as defined both in the ADA and the Human Rights Law."  Dkt 10, pg. 9.

As the above fact make clear, Ms. Czaja was engaged in ongoing discussions regarding an accommodation to her disability in the form of a asking for transfers to other positions for which Ms. Czaja was qualified.  These discussions continued until October 2018.  Thus the issue of how to accommodate Ms. Czaja's disability was ongoing until October of 2018.

<u>Denial of Accommodation</u>

As noted Plaintiff has indicated that moving to an alternative position is an accommodation for a disability specifically provided for by the Defendant.

Further, in the context of the ADA, [a] reasonable accommodation may include, inter alia, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, 'reassignment to a vacant position.'" *McBride v. BIC Consumer Prods. Mfg. Co.,* 583 F.3d 92, 97 (2d Cir. 2009) (quoting 42 U.S.C. § 12111(9)(B)); see also *Jackan v. N.Y. State Dep't of Labor,* 205 F.3d 562, 566 (2d Cir. 2000) ("[T]he term 'reasonable accommodation' may include . . . reassignment to a vacant position." (quoting 42 U.S.C. § 12111(9))). "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified." *McBride*, 583 F.3d at 97. "An employee is qualified for a position only if she can perform its essential functions." *McBride*, 583 F.3d at 98; see *Rodal*, 369 F.3d at 120; see also *Jackan*, 205 F.3d at 565-66; *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 98 (2d Cir. 1999). In *Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 299 (2d. Cir. 2013).

Thus the issue of an accommodation of includes the issue of a transfer to an open position for which the Plaintiff is qualified and is not limited to her actually returning to work as a flight

attendant, and the interactive process was in play until October 2018.

Plaintiff indicated in her complaint in July 2018 sent an email to Delta Accommodations requesting confirmation as to whether Delta could help her find a new position. Ms. Czaja received an automatic reply from Delta Accommodations informing stating, "You will be contacted upon review of this email request, if you are a: candidate for a Delta position seeking an accommodation for assistance with the application process due to a medical impairment, or; current Delta employee seeking a job accommodation or participating in the Alternative Position Program."

The July 30, 2018 call Ms. Czaja had with Sue Rice from Delta Accommodations was only about accommodations that were approved within the uniform guidelines. At no point did Ms. Rice mention anything to Ms. Czaja about Delta helping her identify and secure another position at Delta.

On October 26, 2018 Czaja was finally able to speak with Ms. Sanders who reference materials indicating that Ms. Czaja could not return to work as a flight attendant. At no point in this conversation did Ms. Sanders advise Ms. Czaja on how Delta might help her find another position.

The Plaintiff has shown that she had, indeed has, a disability within the meaning of the ADA. She has shown that has informed her employer of this disability and has shown that this disability affected her ability to do the work of a flight attendant, she has shown that a reasonable accommodation can include transfer to alternative positions which she requested and was denied.

## CONCLUSION

For the reasons discussed above, Plaintiff respectfully request this Court to deny Defendant's Motion to Dismiss and permit Plaintiff them to proceed with litigation of her claims.

Dated: March 18, 2021
       Buffalo, New York


   **s/ Charles L. Miller, II**
   CHARLES L. MILLER, II, ESQ.
   Law Office of Lindy Korn, PLLC
   Attorney for James P. Lalley
   Electric Tower, Ninth Floor
   535 Washington Street
   Buffalo, New York 14203
   716-856-5676
   716-507-8475 (facsimile)
   E-Mail:  cmiller@lkorn-law.com